

Signed June 26, 2013.

_____
Ronald B. King
United States Chief Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| RONALD ORRA STEVES AND § | CASE NO. 09-53240-RBK | |
| VIRGINIA MARTINEZ STEVES, § | | |
| § | | |
| DEBTORS § | CHAPTER 7 | |
| _____ § | | |
| § | | |
| CARL LABELLA AND ALICIA § | | |
| LABELLA § | | |
| § | | |
| VS. § | ADVERSARY NO. 09-5129-RBK | |
| § | | |
| RONALD ORRA STEVES AND § | | |
| VIRGINIA MARTINEZ STEVES § | | |

**OPINION**

In 2009, Ronald Orra Steves and Virginia Martinez Steves ("Debtors") filed a petition under Chapter 7 of the Bankruptcy Code. Carl Labella and Alicia Labella (collectively, "the Labellas," "Plaintiffs," or "Dr. Labella") filed this adversary proceeding requesting that their claim be declared nondischargeable as a debt obtained by fraud or false representation under section 523(a)(2)(A) of

the Bankruptcy Code. The Labellas' claim arose from alleged false representations made by Mr. Steves in order to secure a pool construction contract.

After a bench trial, this Court determined that the Labellas' claim against Mr. Steves was nondischargeable as a debt obtained by false pretenses, a false representation, or actual fraud, pursuant to 11 U.S.C. § 523(a)(2)(A). (ECF No. 25) The Court awarded judgment against Mr. Steves in the amount of $49,134.67 and a take-nothing judgment in favor of Mrs. Steves. Findings of fact and conclusions of law were stated on the record following the close of the evidence, pursuant to FED. R. BANKR. P. 7052. Mr. Steves subsequently appealed to the United States District Court for the Western District of Texas. (ECF No. 31)

On August 5, 2011, the Honorable Fred Biery, United States District Court, Western District of Texas, rendered an Opinion affirming the judgment: "In sum, substantial evidence raised during the trial provides support for each of the Bankruptcy Court's factual findings which Mr. Steves challenges on appeal. . . . [T]his court agrees with the Bankruptcy Judge that Mr. Steves' debt to Carl Labella and Alicia Labella is nondischargeable." (ECF No. 43) Mr. Steves then appealed to the United States Court of Appeals for the Fifth Circuit.

On July 23, 2012, the Court of Appeals for the Fifth Circuit issued a per curiam Opinion vacating the District Court's and Bankruptcy Court's orders and remanding the case for further factual findings. The Fifth Circuit found that it was "difficult to discern what representation Mr. Steves made to Dr. Labella that was untrue and material, with the intent to deceive, and upon which Dr. Labella relied to his detriment." (ECF No. 44)

FINDINGS OF FACT

1. Prior to their venture into the pool construction business, the Debtors owned and operated a corporation called Teamco Services, Inc. which subcontracted for Palm Harbor Homes, a mobile home and manufactured home retailer. Primarily, Mr. Steves constructed flatwork consisting of sidewalks, underpinnings, decks, driveways, and foundations for manufactured and mobile homes.

2. In April 2006, Mr. Steves decided to enter the pool construction business. Leisure Pools is an international pool manufacturer which grants franchises to companies throughout the United States to install fiberglass pool shells. Leisure Pools of South Texas ("LPST"), a corporation owned and operated by Jess Asper, was such a franchise. On April 28, 2006, Mr. Steves formed a new corporation called Leisure Construction, Inc. ("LCI"). LCI then began to operate as a subcontractor for LPST for a period of slightly over one year. Mr. Steves claimed that LCI installed between 27 and 30 pools as a subcontractor. The evidence was unclear as to exactly what work was performed by LCI as a subcontractor, but it is clear that LCI and Mr. Steves did not handle the process from start to finish.

3. After approximately one year of subcontracting for LPST, Mr. Steves decided to acquire his own franchise from Leisure Pools. Instead of installing pools as a subcontractor, LCI began to handle the pool sale and installation process from start to finish.

4. On June 7, 2007, Virginia Steves executed an assumed name certificate for LCI as "Koala Pools." It was filed on June 27, 2007. She was listed as the Vice President of Leisure Construction, Inc. d/b/a Koala Pools. She was the bookkeeper for all pool-building operations.

5. Plaintiff, Dr. Carl Labella, is an oral and maxillofacial surgeon who, at the time of the trial, was in residency at Wilford Hall Hospital at Lackland Air Force Base. Plaintiff, Alicia Labella, is his wife.

6. In April 2008, Dr. and Mrs. Labella were searching for a home to purchase in the Helotes area. The Labellas had been saving money for at least three years to build a pool at their future home. While looking for homes, a realtor introduced them to Mr. Steves. At the time, Mr. Steves was installing a pool in the neighborhood in which they were looking for a home. Negotiations between Mr. Steves and Dr. Labella began at this point.

7. According to Dr. Labella, Mr. Steves made the following representations at their first meeting:

    a. that he had "numerous years in the pool building experience [sic]";

    b. that he was "currently with Koala Pools, which was a family-owned business";

    c. that "he had been building pools for about four years";

    d. that over a "four-year period of time," Koala Pools built "a dozen or so pools per year."

8. Mr. Steves's claim in 2008 that he had been building pools for four years was not true. His claim that he had numerous years in the pool building business was also untrue. By his own admission, he became involved in the pool installation business as a subcontractor in 2006. In addition, his claim that he had personally built a dozen or more pools a year for four years was untrue.

9. In May 2008, the Labellas purchased a home in Helotes, Texas. After considering bids from Mr. Steves and two other companies, the Labellas accepted the bid from Mr. Steves. Dr. Labella stated at trial that this decision to contract with Mr. Steves was expressly based on the representations made to the Labellas by Mr. Steves. In fact, two other bids were lower in price than Mr. Steves's, but Dr. Labella chose Ron Steves in large part because of the representations that it was a successful family owned business which had built dozens of pools for many years.

10. On May 19, 2008, Virginia Steves filed an assumed name certificate for herself, as sole proprietor, under the name of "Koala Pools & Spas." Neither Mr. Steves nor Mrs. Steves informed the Labellas of this fact. Neither LCI nor Ronald Steves was the same as Koala Pools & Spas. This fact is not disputed: Mrs. Steves admitted as much at trial.[1]

11. On or about May 20, 2008, Mrs. Steves opened a new bank account at Bank of America in the name of "Virginia M Steves Sole Prop dba Koala Pools & Spas" ("KPS account"). Mrs. Steves said it was "opened a few days prior," but could not provide the exact date. No transactions occurred in the bank account until May 21.

12. On May 20, 2008, the Labellas entered into a written contract for the construction of a fiberglass pool on their property. The contract price was $60,000, to be paid in four installments: $27,000; $27,000; $3,000; and $3,000. The Labellas believed that they were entering into a contract with Mr. Steves and Koala Pools. The contract, however, named "Carl and Alicia Labella" and "Koala Pools & Spas" as the contracting parties. Both Dr. and Mrs. Labella signed this contract (the

---

[1] "Q: The name of the company was in you, --
A: Under my name.
Q: – as sole proprietor?
A: That's correct." (Tr. 99, January 10, 2011)

5

Koala Pools Construction Agreement) along with Ron Steves, who signed in the name of "Koala Pools and Spas." No one else signed the contract.

13. The contract stated that Koala Pools & Spas had "extensive experience" in the "swimming pool installation industry" and in "all phases of swimming pool construction." Koala Pools & Spas, as an assumed name of Virginia Steves as of May 19, 2008, however, had been in existence for approximately 24 hours at the time this contract was signed and could not have had "extensive experience." In addition, Koala Pools & Spas had absolutely no money and no financial ability to perform the job. In reality, "Koala Pools" was insolvent and "Koala Pools & Spas" was a startup business with no money.

14. The first payment of $27,000 was paid to Mr. Steves concurrently with the signing of the contract. The KPS account shows the amount of this check was deposited on May 21.

15. The deposit of $27,000 was the first transaction in the KPS bank account.

16. Mr. Steves admitted during trial that one of the reasons they created this new account and deposited funds into it was because they "felt that if [they] deposited the money in the Frost Bank [account, their usual checking account], that because [they] were getting into debt with [Frost Bank], that it would just be pulled out." Presumably, Frost Bank would have offset any new deposits to satisfy preexisting debt owed by the Debtors.

17. Mr. Steves promptly began construction. Testimony and evidence showed that he was on-site and actively working to install the pool in May and June of 2008. For approximately one month, work went smoothly. On June 25, 2008, Mrs. Labella wrote a check to "Koala Pools" for

$27,000 to cover the second installment payment under the contract. The check was written from the joint checking account of the Labellas at USAA Bank.

18. On June 27, 2008, however, the first sign of trouble emerged. Dr. Labella was contacted by a teller at USAA Bank. The teller informed Dr. Labella that Virginia Steves was attempting to cash the second check. After the teller asked Dr. Labella a series of questions about the transaction, Dr. Labella gave oral permission for Virginia Steves to cash the check. Mrs. Steves wrote her own name on the check, however, altering the payee line to read "Koala Pools *or Virginia Steves*." Mrs. Steves claimed Dr. Labella gave her permission to do this, while Dr. Labella expressly denied this. The only explanation given for cashing the check, as opposed to depositing it, was that the Steveses needed cash to pay for the pool shell.

19. In July or August of 2008, work on the Labellas' pool became increasingly erratic. Eventually, work completely stopped. The work stoppage was due to a variety of reasons, but primarily seemed to stem from two reasons: Mr. Steves's health and a shortage of funds.

20. According to Mr. Steves, he was merely "four to five hours" away from being able to start the next phase of construction–the concrete pour–before Dr. Labella ordered construction halted. Mr. Steves admits, however, that he did not have the money–a mere $4,000–to pay for the next step in construction.

21. At the point construction stopped, the pool was only partially completed. The shell had been installed, but very little work apart from that had been completed. Significant work such as pool repair, pool finishing, decking, stairways, landscaping, and electrical still needed to be completed.

22. The electrician hired by Dr. Labella to help finish the pool testified that no electrical work had been done except for a light which was not correctly connected. There was no connection to the pump or timer; junction boxes, switches, and GFCI protection had to be installed; and the line to the light was corrupted and had to be dug up and regrounded.

23. While vendors were paid with checks from the KPS account, many personal expenses and cash withdrawals were paid from the KPS bank account. Due to the lack of funds, the Steveses used the KPS bank account as if it were a personal checking account.

24. Dr. Labella testified that after months of unsuccessfully attempting to reach Mr. Steves thirty to forty times, Mr. Steves finally returned a phone call. Mr. Steves informed Dr. Labella that he was having financial trouble, would not be able to complete the pool, and that he was taking another job. With the frustration of having paid $54,000 for a $60,000 unfinished pool, the Labellas were forced to hire two contractors to repair and complete the pool at an additional cost of $27,581.67. They obtained a default judgment against the Debtors in state court for damages and attorney's fees and now seek to have the debt declared nondischargeable.

## CONCLUSIONS OF LAW

***The Labellas' debt is nondischargeable because it was obtained by false representation***.

At trial, the Labellas claimed only one ground upon which their claim is nondischargeable under section 523: the debt was obtained by false pretenses, false representation, or actual fraud under section 523(a)(2)(A). As with all claims for exceptions to discharge, the party seeking the exception bears the burden of proof. This party must prove each element by a preponderance of evidence. *See* **Grogan v. Garner**, 498 U.S. 279, 286, 291 (1991).

In determining dischargeability, the Fifth Circuit has distinguished debts arising from false representations from those arising from actual fraud. ***RecoverEdge L.P. v. Pentecost***, 44 F.3d 1284, 1292 (5th Cir. 1995). In order to prevail on an allegation of false representation, the plaintiff must prove three elements: (1) the representations were "knowing and fraudulent falsehoods"; (2) the representations described past or present facts; and (3) the representations were relied upon by the plaintiff. ***Allison v. Roberts*** (***In re Allison***), 960 F.2d 481, 483 (5th Cir. 1992).

    1.    ***Mr. Steves's representations were knowing and fraudulent falsehoods.***

The Fifth Circuit has held "knowing and fraudulent falsehoods" to be those "involving 'moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient.'" ***Allison***, 960 F.2d at 483 (citing 3 COLLIER ON BANKRUPTCY ¶ 523.08[4] (15th ed. 1989)). The Court finds that Mr. Steves made false representations about his pool construction experience and abilities, as well as regarding the specific legal entity that was a party to the contract.

Primarily, Mr. Steves falsely represented the number of years of experience he had in the pool business. At trial, Dr. Labella testified that prior to signing the contract in May 2008, Mr. Steves represented that he had approximately four years of experience in the pool business. The evidence shows, however, that prior to forming Leisure Construction, Inc. in April 2006, Mr. Steves had no experience in the pool business. His previous construction experience was doing concrete flatwork for mobile or manufactured homes–a significantly different field. When the contract was signed in May 2008, Mr. Steves had merely two years of experience in the pool installation business: one year as a subcontractor, and one year as a turnkey pool builder. As an experienced salesman and

9

contractor, Mr. Steves was certainly aware of the value customers place on experience and how it is often the deciding factor in choosing a contractor. Mr. Steves falsely represented that he had double the amount of years of experience than he actually had in order to induce Plaintiffs to sign the contract with him.

In addition, Mr. Steves falsely represented his experience and abilities generally. He claimed to have personally built approximately 50 pools in two years, or an average of one pool every two weeks–an outstanding rate of completion that is not credible, especially considering the lack of any documentation or other evidence of successful completion of any of these pools. Further, he described his experience as "extensive" and of "numerous years." The contract stated that Koala Pools & Spas had "extensive experience" in pool installation and had "experiences in all phases of swimming pool construction." Of course, this is impossible: Koala Pools & Spas was a startup and simply an assumed name for Virginia Steves as sole proprietor, who had no experience in the actual installation of swimming pools.

Mr. Steves also falsely represented the specific legal entity that was party to the contract. Mr. Steves incorporated Leisure Construction, Inc. in April 2006, and operated it as a subcontractor of Leisure Pools of South Texas. In June 2007, Mrs. Steves filed an assumed name certificate for Leisure Construction, Inc. with the trade name of Koala Pools. Around this time, LCI ceased subcontracting for LPST and began to operate independently. In April 2008, Mr. Steves and Dr. Labella met for the first time and began to discuss a pool installation contract. The participants in the negotiation of the pool contract were Dr. Labella and Ronald Steves, an officer of Leisure Construction, Inc. d/b/a Koala Pools. The day before the written contract was signed, however,

Virginia Steves, sole proprietor, filed an assumed name certificate under the name of "Koala Pools & Spas." The parties to the written contract were "Koala Pools & Spas" and "Carl and Alicia Labella."

The end result was that the Labellas, based on Mr. Steves's false representations of experience and abilities, signed a pool construction contract with Virginia Steves, sole proprietor, d/b/a Koala Pools & Spas–a company that had been in existence for less than 24 hours and had no experience in any aspect of the pool installation business. Mr. Steves knew that the Labellas would likely not notice a small difference in the contract; indeed, it is likely that the Labellas thought "Koala Pools & Spas" was simply the legal name for what had previously been referred to as "Koala Pools." Further, the Labellas' first check was deposited into a new bank account opened at a different bank in order to prevent Debtors' old bank from offsetting any deposits and applying their balance toward an outstanding line of credit. Mr. Steves may not have been under any obligation to inform the Labellas of his debt to Frost Bank, but changing the legal entity to a startup business with no money was a significant fact that should have been disclosed. Mr. Steves did *not* inform the Labellas of these facts in order to secure the contract with the Labellas.

  2.  ***The representations described past or present facts***.

A fraudulent misrepresentation under section 523(a)(2)(A) must be regarding "past or current facts." *Allison*, 960 F.2d at 484. This exception is generally inapplicable to future acts, or promises: "[A] promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise is subsequently breached." *Id*. Essentially, this requirement exists to prevent a creditor from using section 523(a)(2)(A) to make a simple breach of contract nondischargeable.

11

The majority of the false representations made by Mr. Steves were regarding his experience–by definition, past facts. Mr. Steves falsely represented his prior experience as considerably more extensive than it actually was in order to induce the Labellas to sign a contract. Further, when the contract was signed, Mr. Steves was falsely representing who was a party to the contract; his actions could be described as a "bait and switch." The false representations he made, therefore, were to past or present facts.

3. ***The Labellas justifiably relied on the misrepresentations of Mr. Steves***.

The Supreme Court has held that section 523(a)(2)(A) requires justifiable, but *not* reasonable, reliance by the aggrieved party on any alleged misrepresentation. ***Field v. Mans***, 516 U.S. 59, 74-75 (1995). A person is justified in relying on a misrepresentation unless he is "capable of appreciating its falsity at the time by the use of his senses." *Id*. at 71. Even if the target of the misrepresentation may have ascertained the truth through a further investigation, he may still be justified in relying on the falsehood. *Id*. at 70.

In this instance, it is clear that the Labellas were justified in relying on Mr. Steves's representations. Dr. Labella met Mr. Steves while Mr. Steves was installing a pool at a house in the same area where the Labellas purchased a home. By all accounts, that pool installation went off without a hitch; thus, nothing would have alerted Dr. Labella to the possibility that Mr. Steves had falsely represented his years of experience. Moreover, there is no way that Dr. Labella could have appreciated the falsity of Mr. Steves's representation that he had constructed approximately 52 pools. This is clearly illustrated by the fact that Dr. Labella believed Mr. Steves had four years of experience–placing the number of pools built at an average of 12-13 per year, an eminently

reasonable number. In addition, Mr. Steves encouraged Dr. Labella to visit his website, and Dr. Labella found nothing on the website that would have made him capable of appreciating the falsity of Debtor's representations. Finally, short of demanding that Mr. Steves show him his bank records, it was simply not possible for Dr. Labella to know that the Debtors were financially insolvent.

Dr. Labella was also justified in relying on Mr. Steves's representation that his business–Leisure Pools, Inc. d/b/a Koala Pools–was the business installing his pool. Dr. Labella believed that he was paying Leisure Pools, Inc. d/b/a Koala Pools–an entity operated by Ron Steves. There was absolutely no way that Dr. Labella could have appreciated through the use of his senses that he had actually contracted with Mrs. Steves's sole proprietorship for the installation of his pool. In order for Dr. Labella to appreciate the falsity of this representation, Dr. Labella would have had to conduct two assumed name searches at the county courthouse. At the time of signing the contract, however, there was nothing that would have alerted Dr. Labella to any irregularity in the contract, and Dr. Labella would have had no reason to believe that Mr. Steves was being anything less than completely forthright.

The Court therefore concludes that the Labellas were justified in their reliance on the misrepresentations of Mr. Steves as to his experience, ability to perform, and as to the specific legal entity that was installing the pool.

Nondischargeability of debt arising from a breached construction contract is a fact sensitive inquiry. In a recent case involving the breach of a construction contract to build a custom home, this Court stated:

> [T]he Court finds that Defendant made false representations about his experience and abilities. Defendant is a salesman by trade and can be

> forgiven for the puffery inherent in any sales transaction. The evidence at trial, however, showed representations that went well beyond mere puffery and into falsehood. Defendant represented that he was equipped with the ability, contacts, and experience to build a moderately expensive custom home for Plaintiff. He showed Plaintiff previous homes he purportedly had built, even though he was not the actual builder of those homes. He led Plaintiff to believe he was a partner in a building company, when he was only an employee. Defendant's false representations were exposed after an investment of more than $350,000 turned into an unfinished and uninhabitable home construction site. Defendant made false representations in the hopes of securing a contract. This was not merely a sales job, but rather a deception which harmed the Plaintiff.

*Green v. Carle* (*In re Carle*), 2010 WL 5394793, at *7 (Bankr. W.D. Tex. 2010). This case is factually similar to *Carle*.

    4.    ***The Labellas' claim is nondischargeable***.

The Labellas' claim against Mr. Steves was procured by false pretenses, false representation, or actual fraud, and the debt is therefore nondischargeable.

### CONCLUSION

Pursuant to Rule 7052, this Opinion constitutes additional findings of fact and conclusions of law of the Court. For the reasons stated herein, the Labellas' judgment against Ronald Steves will be declared nondischargeable. A separate judgment will be rendered.

# # #